## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 23 2019, 5:57 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Cynthia Phillips Smith
Law Office of Cynthia P. Smith
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of T.A.B., Jr., Z.B., C.L., and D.S.L. (Children) and A.L. (Mother);

A.L. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

December 23, 2019

Court of Appeals Case No.
19A-JT-1419

Appeal from the Tippecanoe Superior Court

The Honorable Faith A. Graham, Judge

Trial Court Cause No.
79D03-1809-JT-128
79D03-1809-JT-130
79D03-1809-JT-131
79D03-1809-JT-132

**May, Judge.**

A.L. ("Mother") appeals the involuntary termination of her parental rights to T.A.B. Jr.; Z.B.; C.L.; and D.S.L. (collectively, "Children"). She raises three issues, and we address two of them:[1]

> 1. Whether the trial court's findings support its conclusion that the conditions under which Children were removed from her care would not be remedied; and

> 2. Whether the trial court's findings support its conclusion that termination of parental rights was in Children's best interests.

We affirm.

# Facts and Procedural History

Mother gave birth to T.A.B. Jr. on June 12, 2011; Z.B. on July 24, 2012; C.L. on February 10, 2015; and D.S.L. on May 29, 2016.[2] On May 31, 2016, the Department of Child Services ("DCS") received a report that Mother tested positive for marijuana during delivery of D.S.L. and that D.S.L.'s umbilical

---

[1] Mother also alleges the trial court's findings do not support its conclusion that the continuation of the Mother-Child relationships posed a threat to Children's well-being. Because we hold the trial court's findings supported its conclusion that the conditions under which Children was removed from Mother's care would be not be remedied, we need not consider Mother's argument regarding whether the continuation of the parent-children relationship poses a risk to Children's well-being. *In re L.S.*, 717 N.E.2d 204, 209 (Ind. Ct. App. 1999) (because Indiana Code section 31-35-2-4(b)(2)(B) written in the disjunctive, court needs find only one requirement to terminate parental rights), *reh'g denied, trans. denied, cert. denied* 534 U.S. 1161 (2002).

[2] T.A.B. Sr. ("Father") is the father of Children. His parental rights were also terminated, but he does not participate in this appeal.

cord tested positive for marijuana. Mother again tested positive for marijuana on June 14, 2016. DCS attempted to engage the family in an Informal Adjustment ("IA"), but the IA was unsuccessful because Mother and Father did not engage in services and could not be contacted by DCS.

[3] On July 20, 2016, DCS visited the family home while Father was at work. Mother reported she wanted to leave Father because he choked her and threw her into a corner. Mother and Children relocated to a shelter, and DCS helped Mother create a safety plan, in which Mother agreed to separate from Father, not allow Father around Children, not have contact with Father, and not tell Father where Mother and Children were staying. On July 22, 2016, DCS filed a petition alleging Children were Children in Need of Services (CHINS). Children remained in Mother's care. At the detention hearing and initial hearing held on July 22, 2016, the trial court ordered Father to vacate the family home.

[4] On September 9, 2016, DCS filed a request to remove Children from Mother's care because Mother was not progressing in services, was not properly supervising Children, was using drugs, and did not have employment or housing. At a detention hearing on September 13, Mother agreed to the removal of Children because she was unable to provide for their basic necessities at that time. Children were placed in foster care. The trial court adjudicated Children as CHINS on September 27, 2016.

[5] The trial court entered its dispositional order as to Mother on October 18, 2016, requiring Mother to participate in "home based case management, mental health assessment, substance abuse assessment, random drug screens, and parenting time." (App. Vol. II at 41.) Children were returned to Mother's care on October 2, 2017, for a "trial home visit." (*Id*.) Children remained with Mother until May 29, 2018, when Mother relapsed into marijuana use and Children tested positive for cocaine. During the trial home visit, Children's foster parents provided Mother and Father[3] with respite care because Mother became "overwhelmed" by the situation. (*Id*. at 46.) Children were returned to the care of their foster parents after removal from Mother's care, where they have remained for the pendency of this case.

[6] Mother's compliance with services declined, she continued to use marijuana, she did not have stable housing and employment, and she was often involved in physical altercations with Father and other people. On October 17, 2018, DCS filed a petition for the involuntary termination of Mother's parental rights to Children. The trial court held hearings on the matter on January 3, 2019, and February 12, 2019. On May 17, 2019, the trial court entered its order involuntarily terminating Mother's parental rights to Children.

# Discussion and Decision

---

[3] At some point in time, Father returned to the family home. It is unclear from the record under what circumstances this change in status occurred.

[7] We review termination of parental rights with great deference. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). We will not reweigh evidence or judge credibility of witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id.* In deference to the juvenile court's unique position to assess the evidence, we will set aside a judgment terminating a parent's rights only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*, *cert. denied* 534 U.S. 1161 (2002).

[8] "The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. A trial court must subordinate the interests of the parents to those of the children when evaluating the circumstances surrounding a termination. *In re K.S.*, 750 N.E.2d at 837. The right to raise one's own children should not be terminated solely because there is a better home available for the children, *id.*, but parental rights may be terminated when a parent is unable or unwilling to meet parental responsibilities. *Id.* at 836.

[9] To terminate a parent-child relationship, the State must allege and prove:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State must provide clear and convincing proof of these allegations. *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009), *reh'g denied*. If the court finds the allegations in the petition are true, it must terminate the parent-child relationship. Ind. Code § 31-35-2-8.

[10] When, as here, a judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). We determine whether the evidence supports the findings and whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the juvenile court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

[11] Mother does not challenge the trial court's findings, and thus we accept them as true. *See Madlem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1992) ("Because Madlem

does not challenge the findings of the trial court, they must be accepted as correct."). Mother challenges the trial court's conclusions that the conditions under which Children were removed were not likely to be remedied and that termination is in Children's best interests.

## 1. Conditions Would Not Be Remedied

A trial court must judge a parent's fitness to care for her child at the time of the termination hearing. *In re A.B.*, 924 N.E.2d 666, 670 (Ind. Ct. App. 2010). Evidence of a parent's pattern of unwillingness or lack of commitment to address parenting issues and to cooperate with services "demonstrates the requisite reasonable probability" that conditions will not change. *Lang v. Starke Cty. OFC*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*.

Regarding the conditions under which Children were removed from Mother's care and whether there was a reasonable probability those conditions would not be remedied, the trial court found:

> 2. [DCS] received a report on May 31, 2016 alleging that [Mother] tested positive for marijuana when admitted to the hospital after the birth of [D.S.L.] and that Mother had not received prenatal care.

> 3. Investigation revealed that Mother tested positive for marijuana on May 29, 2016 and that [D.S.L.] also tested positive for marijuana at birth through umbilical cord blood testing. Mother tested positive for marijuana again on June 14, 2016. DCS attempted to implement a Program of Informal Adjustment ("IA") with the family to address these concerns. However, the

IA was not successful. The parents did not begin services and DCS was unable to contact the parents for several weeks.

4. On July 20, 2016, DCS visited the home while [Father] was at work. Mother disclosed that Father choked her and threw her in a corner. Mother indicated that she wanted to leave the relationship as it was not safe for her or the children. Mother and the children went to a shelter. Mother signed a safety plan on July 21, 2016 that she would separate from Father, not allow Father around the children, not have contact with Father, and not allow Father to know where Mother was staying.

* * * * *

6. On September 9, 2016, DCS filed a request to remove the children from Mother's care due to Mother's lack of progress in services, issues with supervision of the children, inability to provide basic necessities, drug and alcohol use, and lack of employment and housing. [D.S.L.] had been found face down on a bed when Mother was not in the room. On a different occasion, [M]other was unaware when the stroller with a child in it rolled into the street. [D.S.L.] and [C.L.] tested positive for marijuana on a hair screen collected August 31, 2016. Mother and the children were staying at a shelter which Mother had to exit by September 12, 2016. Mother had no plan for housing thereafter and no plan to keep the children safe. . . .

* * * * *

10. Mother completed a substance abuse assessment in October of 2016. Mother denied smoking marijuana while the children were present but admitted using while the children were sleeping. Mother reported smoking marijuana about three (3) to four (4) times a month to relax and escape. Mother denied such use affected her ability to care for the children. Mother reported a

history of domestic violence with Father and indicated that domestic violence was the catalyst for wanting to escape. It was recommended that Mother complete an Intensive Outpatient Program (IOP), submit to random drug screens, and attend support groups. Mother expressed an interest in treatment and individual counseling to address trauma that might lead to substance abuse.

11. Mother started substance abuse treatment through Living in Balance (LIB), which is an Intensive Outpatient Program (IOP), in January of 2017. Mother did not complete the three (3) months of intensive sessions due to absences. Mother returned to the LIB program in March of 2017 and completed the intensive portion. Mother planned to start the aftercare program but did not do so until September of 2017. Mother failed to attend support groups before starting the aftercare program. After relapsing, Mother was again referred to LIB in June of 2018 and was provided a recovery coach to assist with her sobriety. Mother attended one (1) session of LIB then did not return until December of 2018. Mother has since failed to attend consistently. Mother's recovery coach terminated services for lack of engagement.

12. Mother continued to test positive for marijuana on a consistent basis from the beginning of the case until Spring of 2017. Mother maintained sobriety until April of 2018, shortly before the trial home visit ended. Since that time, Mother has not produced a clean drug screen and has failed to submit to many drug screens.

13. Mother completed a mental health assessment in January of 2017. Mother was diagnosed with Major Depressive Disorder and it was recommended that Mother participate in individual therapy. Mother initially worked diligently in therapy and made progress during sessions she attended. Mother failed to attend any sessions in April, June and July of 2017. Service providers

noted that Mother's untreated depression often made motivation difficult. Additionally, Mother was stressed and overwhelmed during the trial home visit. Therapy was court ordered again after continued domestic violence and a new referral was made in August of 2018. Mother was discharged after she failed to schedule any appointments. Another referral was placed in November of 2018. Mother only attended one (1) session in late January or early February of 2019. Mother does not believe therapy is necessary and denies any mental health issues or current struggles with depression.

14. In addition to case management, Mother was provided Homebuilders intensive home-based services on two (2) occasions. The first referral was on July 23, 2016 after Mother left Father's home and moved to a domestic violence shelter. Homebuilders worked with [M]other over ten (10) hours per week to assist with obtaining information and completing applications for housing, applying for an order of protection against Father, applying for employment, working towards her GED, and working on coping skills. Homebuilders also assisted [M]other with applying for WIC, food stamps, TANF, child care vouchers, and Headstart. The second referral was on November 30, 2017 to assist with providing a safe environment for the children, increasing parenting skills, finding stable housing, childcare, safe sleep, employment, and co-parenting. [sic]. Mother had reported multiple incidents of domestic violence and stated she could no longer live in the home with Father. Homebuilders helped relocate Mother and the children to the domestic violence shelter on December 4, 2017. Homebuilders indicated that Mother was very motivated and recommended step-down services to home-based case management.

15. Mother participated in home-based case management to assist with housing, employment, parenting education, safe sleep practices, and other issues. At times, Mother participated well and was motivated to make progress. At other times, Mother

failed to participate consistently and was discharged from providers. The most recent referral was made in December of 2018, but Mother has only attended one (1) session. Mother was not able to sustain any progress made during periods of participation.

16. Despite services provided, Mother failed to establish a stable means of providing for the children. Throughout most of the CHINS case, Mother was unemployed. Whenever Mother did obtain employment, she did not maintain any job for more than a few months at a time and remained financially dependent upon Father. At the time of the termination hearing, Mother had been employed for approximately one (1) week.

17. Mother also failed to establish a safe and stable home for the children. When the CHINS case began, Mother and Father were residing together with the children and Father was supporting the household. Due to domestic violence, Mother and the children moved to a shelter in July of 2016 and remined there until September of 2016. Mother was homeless for a while, then began residing with Father again in January of 2017. Mother remained in a home with Father until the children were placed back in the home for a trial home visit in October of 2017. After a domestic violence incident in December of 2017, Mother left Father and again moved to a domestic violence shelter. Mother and the children remained at the shelter until Mother obtained an apartment on March 30, 2018. Mother left the apartment in October of 2018 and has since been staying with various friends and family.

18. Even when Mother had her own housing, it was not safe. Father continued to cause issues, including holding Mother at knife point. On September 6, 2018, police were called to the home after Mother's friend made sexual advances toward her then got upset and punched her in the face. Mother required stitches in her mouth as a result. On October 14, 2018, [M]other

had an altercation at her home with two (2) people who reportedly thought she had something in her house and it was a "robbery gone bad." Mother stated her house was destroyed and they stole a gun she obtained after an earlier incident with Father.

19. On June 14, 2017, Mother gave birth to her fifth child with Father and the baby's cord blood tested positive for alcohol. The fifth child was not removed from parents until May of 2018 when the other children tested positive for marijuana and cocaine during the trial home visit. The fifth child is not a subject of this termination proceeding.

20. Mother has generally done well during parenting time. It was noted that Mother provided attention to each of the children and she was prepared for the visits. There were no safety concerns during Mother's visits. In April of 2017, parenting time was combined for Mother and Father since they had resumed their relationship and were living together. It was noted that there was tension between the parents and that Father would leave during the visits. In May of 2017, parents' visits moved into the home, then in June of 2017, parents' visits progressed to semi-supervised. On October 2, 2017, a trial home visit started with both parents. During drop ins, service providers noted concerns with unsafe sleeping for the baby, lack of supervision, lighters within reach of the children, food left around the house, and deteriorating home conditions. Providers spoke with [M]other and Father multiples times about these issues, but the problems continued. It was also noted that Mother felt overwhelmed because Father was not helping and there was frequent fighting between the parents. Mother admitted she physically attacked Father when she discovered that Father had a girlfriend. Mother also indicated she did not feel the home was safe for the children. Mother and the children moved to a domestic violence shelter in early December of 2017. Mother was overwhelmed as she and the five (5) children lived in one (1)

room while at the shelter. Mother also left the children with unapproved individuals at the shelter.

21. When Mother and the children moved into an apartment, there continued to be issues of unapproved people in the home with the children and Mother being overwhelmed with the care of the children and lack of support. Despite domestic violence issues, Father was often observed in the home. Mother indicated that Father was causing her stress and she had difficulty getting him to leave. On May 22, 2018, Mother called law enforcement as Father refused to leave her home. Additionally, Mother relapsed and tested positive for marijuana on April 9 and 17, 2018. Mother often failed to call the drug screen line and missed drug screens on April 12, April 30, May 7, and May 15 of 2018. The children were drug screened and all four children tested positive for cocaine. [D.S.L.] and [C.L.] also tested positive for marijuana. This was the second time for [C.L.] to test positive for marijuana and the third time for [D.S.L.] to test positive. Neither parent could explain why the children tested positive for cocaine. Mother initially blamed father but later stated that this was a lie. Mother now believes that children were exposed in the shelter and testified that a woman who cared for the children had a crack pipe. Mother fails to acknowledge that she was responsible for making sure the children were safe and not exposed to drugs. The children were removed from parents again on May 29, 2018.

22. After the trial visit ended, Mother struggled to consistently attend scheduled parenting time sessions. When Mother did attend, she arrived on time, was prepared with supplies, and engaged with the children. After a violent episode with Father on August 24, 2018 during which Father took Mother's phone, Mother failed to attend visits for three (3) months. Mother resumed parenting time in November 2018 but continued to miss visits which remained fully supervised. Parenting education was

recommended to help Mother understand the emotions and trauma experienced by the children.

* * * * *

37. Both parents love the children, but neither can provide the children with a safe and stable home that is free of domestic violence and substance abuse. Although services have been offered since July of 2016, the parents continue to struggle with the same issues that caused removal of the children: homelessness, lack of steady employment, substance abuse and domestic violence. Neither parent has produced a clean drug screen since the trial home visit ended. Mother still believes marijuana use is not an issue despite her children testing positive for marijuana multiple times. Domestic violence continues between the parents. Father held Mother at knife point as recently as August of 2018. Although there were periods when the parents would actively engage in services, neither was able to sustain any progress made towards reunification due to the unresolved issues of substance abuse and domestic violence.

(App. Vol. II at 40-6.)

[14] Mother contends the trial court's findings do not support its conclusion that there was a reasonable probability that the conditions under which Children were removed from her care would not be remedied because she completed most services offered to her and had improved her situation since Children were removed from her care. While we acknowledge Mother's periods of progress, we cannot ignore her inconsistent compliance with services. Therefore, we hold the findings do support the trial court's conclusion that there was a reasonable probability that the conditions under which the children were

removed would not be remedied. *See In re K.T.K.*, 989 N.E.2d 1225, 1234 (Ind. 2013) (mother's recent sobriety outweighed by her history of substance abuse and neglect of her children).

## 2. Children's Best Interests

In determining what is in Children's best interests, a trial court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *In re A.K.*, 924 N.E.2d 212, 223 (Ind. Ct. App. 2010), *trans. dismissed*. A parent's historical inability to provide a suitable environment, along with the parent's current inability to do so, supports finding termination of parental rights is in the best interests of the child. *In re A.L.H.*, 774 N.E.2d 896, 990 (Ind. Ct. App. 2002). The recommendations of a DCS case manager and court-appointed advocate to terminate parental rights, in addition to evidence that conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in Children's best interests. *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009).

Regarding Children's best interests, the trial court found:

> 34. Services have also been provided to [Children]. [T.B.] was diagnosed with Generalized Anxiety Disorder and participated in therapy. [T.B.] witnessed domestic violence, worried about everything, reported difficulty sleeping, and displayed aggressiveness during visits. [Z.B.] was diagnosed with Adjustment Disorder with Anxiety and participated in therapy. Witnessing domestic violence and substance abuse and living in a shelter were very traumatic for [Z.B.] but she has stabilized. [C.L.] received speech therapy but was discharged during the

trial home visit due to missed appointments. [C.L.] has resumed speech therapy. [D.L.] completed a First Steps evaluation and receives services for speech delays and anger management.

35. [Children] are doing well in foster care. During the trial home visit, the foster parents provided support to Mother and Father by taking [Children] on occasion to provide respite for the parents. When the trial home visit ended, [Children] returned to the same foster parents who are willing adopt. [Children] are otherwise adoptable.

36. CASA Staff Advocate, Leigh Ann Fricke, supports termination of parental rights and adoption in the best interests of [Children]. During the trial home visit, CASA was concerned with the deteriorating conditions of the home, ongoing domestic violence, and Mother being overwhelmed. After Mother left the shelter and obtained an apartment, CASA was again concerned about the events occurring the home as Mother was overwhelmed and both parents relapsed into marijuana [use]. CASA notes the relationship between Mother and Father is not stable. [Children] have now been in the system for over nine hundred (900) days. CASA believes [Children] need and deserve permanency.

(App. Vol. II at 46.)

[17] Mother argues these findings do not support the trial court's conclusion that termination of her parental rights is in Children's best interests because they do not take into account Mother's bond with her Children. She contends "[t]o terminate this bond based upon an alleged lack of housing, a one-time cocaine positive test for children, and alleged sporadic marijuana use by Mother is not in the children's best interests." (Br. of Appellant at 21-2.) However, the trial

court's findings note multiple instances of Mother's drug use, her housing and employment instability, and domestic violence in the home. The findings demonstrate mother's drug use and homelessness are persistent problems. Over the three years this matter has been pending, Mother has not fully engaged in services and has failed to participate in visitation with Children for extended periods of time. Children are receiving consistent care with foster parents, who also ensure Children's trauma is properly treated. Thus, we hold the trial court's findings support its conclusion that termination of Mother's parental rights is in Children's best interests. *See In re A.P.*, 991 N.E.2d 75, 83 (Ind. Ct. App. 2012) (despite mother's bond with children, termination was in children's best interests based on mother's continued drug use and noncompliance with services).

# Conclusion

[18] The trial court's findings support its conclusions that the conditions under which Children were removed from Mother's care would not be remedied and termination of Mother's parental rights was in Children's best interests. Accordingly, we affirm the trial court's decision.

[19] Affirmed.

Crone, J., and Pyle, J., concur.